**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**LINDA L. BOYD,**

        **Plaintiff,**

**v.**                                     **Civil Action No.: 2:09-CV-67**
                                                  **JUDGE MAXWELL**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING**
**THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT [8], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [7],**
**AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.      INTRODUCTION

On June 1, 2009, Plaintiff Linda L. Boyd ("Plaintiff"), by counsel Sue A. Howard, Esq., filed

a complaint in this Court to obtain judicial review of the final decision of Defendant Michael J.

Astrue, Commissioner of Social Security ("Commissioner" or "Defendant") pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g).  On August 3, 2009, the

Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an

answer and administrative transcript of the proceedings.  On September 3, 2009 and October 1,

2009, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment [7] [8].

Following review of the motions by the parties and the transcript of administrative proceedings, the

undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. RELEVANT PROCEDURAL AND FACTUAL BACKGROUND AND REVIEW OF ADMINISTRATIVE LAW JUDGE DECISION

### A. Procedural Background

On September 19, 2006, Plaintiff applied for disability insurance benefits, alleging disability as of July 1, 2006 due to severe pain in her knees and elbows. Tr. at 78 & 95. On November 3, 2008, the United States Administrative Law Judge ("ALJ") held a hearing, and Plaintiff testified under oath. Tr. at 43-58. *See* 20 C.F.R. § 404.929 (hearing before an administrative law judge). On November 7, 2008, the ALJ issued an unfavorable decision to Plaintiff, finding her not entitled to disability insurance benefits. Tr. at 9-19. The Appeals Council denied Plaintiff's request for review. Tr. at 1-4. *See* 20 C.F.R. § 404.967 (Appeals Council review--general). Plaintiff now requests judicial review of the ALJ decision denying her application for disability.

### B. Standard for Judicial Review of a Decision by the Administrative Law Judge in a Disability Case

Judicial review of a final decision regarding disability benefits is limited to determining whether the findings...are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g). "The findings...as to any fact, if supported by substantial evidence, shall be conclusive" *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *See Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938))...Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir.1962). Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the

evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979). **"This Court does not find facts or try the case *de novo* when reviewing disability determinations."** *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976); "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.1972). "The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"

*See Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990) (emphasis added). In applying these legal standards, the Court reviews the decision by the ALJ.

### C.      Standard for Disability and Five-Step Evaluation Process

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work..."[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A). In order for the ALJ to determine whether a plaintiff is disabled and therefore entitled to disability insurance benefits, the Social Security Administration has established a five-step sequential evaluation process. The five steps are as follows (including Residual Functional Capacity Assessment prior to Step Four):

Step One:      Determine whether the plaintiff is engaging in substantial gainful activity;

Step Two:      Determine whether the plaintiff has a severe impairment;

Step Three:      Determine whether the plaintiff has a "listed" impairment;

* Residual Functional Capacity Assessment *<br/>
(Needs to be Determined Before Proceeding to Step Four)

Step Four:     Compare residual functional capacity assessment to determine whether the plaintiff can perform past relevant work;

Step Five:     Consider residual functional capacity assessment, age, education, and work experience to determine if the plaintiff can perform any other work.

*See* 20 C.F.R. § 404.1520 (evaluation of disability in general). In following the five-step process and coming to a decision, the ALJ makes findings of fact and conclusions of law. This Court will review the decision by the ALJ to determine whether it is supported by substantial evidence, in accordance with 42 U.S.C. § 405(g) and *Hays*.

**D.     Review of ALJ Application of Five-Step Evaluation Process and Whether it is Supported by Substantial Evidence**

**1.     Step One: Determine whether the Plaintiff is Engaging in Substantial Gainful Activity**

Substantial gainful activity is work activity that is both substantial and gainful:

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized....

If you are working or have worked as an employee...[g]enerally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity...

[I]f you are self-employed [w]e will consider your activities and their

> value to your business to decide whether you have engaged in substantial gainful activity...
>
> If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled *regardless of your medical condition* or your age, education, and work experience.

*See* 20 C.F.R. § 404.1572; *see also* 20 C.F.R. § 404.1574(a) (evaluation guide for employees who are not self-employed); *see also* 20 C.F.R. § 404.1575(a)(2) (evaluation guide if you are self-employed); *see also* 20 C.F.R. § 404.1520(b) (emphasis added). The ALJ found that Plaintiff has not engaged in substantial gainful activity at any time relevant to this decision. Tr. at 14. The parties do not dispute ALJ's findings in Step One.

### 2.     Step Two: Determine whether the Plaintiff has a Severe Impairment

> At the second step, we consider the medical severity of your impairment(s)...[A] severe impairment... [is] any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities...We will not consider your age, education, and work experience...
>
> An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities. Basic work activities...mean[s] the abilities and aptitudes necessary to do most jobs. Examples of these include--1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

*See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521; *see also Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666 (4th Cir. 1989). The ALJ found Plaintiff to have the following severe impairments: coronary artery disease, status post myocardial infarction, and osteoarthritis of the right knee. Tr. at 14.

### a.        Whether Plaintiff's Elbow Condition is a Severe Impairment

Plaintiff contends that she also has a severe impairment in her right elbow.  Pl. Doc. 7 at 3 & 6.  The Commissioner responds that Plaintiff's elbow condition is not severe because it does not significantly limit her ability to perform basic work activities.  Comm'r Doc. 9 at 9.  This Court will review the record in the case to determine whether substantial evidence supports the ALJ's decision to omit Plaintiff's elbow from the severe impairments finding.

In 1993, Plaintiff sustained an elbow injury at work and had surgery on her right elbow by Dr. Haggerd [sic].  Tr. at 98 & 100-01.  After filing for disability in 2006, Plaintiff reported that she had not seen a doctor regarding her elbow since 1993.  Tr. at 98 & 100-01.  Moreover, following her elbow injury in 1993, Plaintiff continued working until July 2006.  Tr. at 95-96.  In September 2006, Plaintiff applied for disability insurance benefits, alleging disability as of July 2006 due to severe pain in her knees and elbows.  Tr. at 78 & 95.  Therefore, the evidence shows that Plaintiff had elbow surgery in 1993 but continued to work until 2006.  Tr. at 96 & 98.  This conflicts Plaintiff's allegation of a severe impairment since Plaintiff was able to perform work activity following her elbow injury until 2006.  "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521.

In February 2007, Joseph Schreiber, D.O., examined Plaintiff for a disability determination.  Tr. at 193-96.  Plaintiff reported that in approximately 1990, she had elbow surgery by Dr. Haggard.  Tr. at 194.  Plaintiff told Dr. Schreiber that she last worked on July 1, 2006 and that she owned and managed the local "Rendezvous Club" for 13 years.  Tr. at 195.  Plaintiff said she sold the bar and retired.  Tr. at 195.  Plaintiff reported to Dr. Schreiber that her right elbow cramps if she writes for

too long a period. Tr. at 194. Plaintiff stated that she does not have any current swelling, locking, grinding, or heat in her elbow. Tr. at 194. She also reported no peripheral numbness, burning, or tingling. Tr. at 194. Plaintiff stated that she is able to do all her normal activities of daily living ("ADLs"); all her normal household chores; and that she plans on residing by herself in her new home that she recently purchased. Tr. at 195. Dr. Schreiber found no evidence of heat, erythema, tenderness, effusion, or crepitus in Plaintiff's elbow. Tr. at 196. Dr. Schreiber found a normal range of motion in Plaintiff's elbow and normal upper extremity strength. Tr. at 197.

In April 2007, Plaintiff completed a disability pain questionnaire. Tr. at 139. Plaintiff reported pain in her elbow that was aching, stinging, and cramping. Tr. at 139. Plaintiff said she has the pain mostly when she writes. Tr. at 139. Plaintiff stated that she cannot hold a pen or type for very long. Tr. at 139.

At the ALJ Hearing in November 2008, Plaintiff testified that she only took over the counter anti-inflammatory medication for pain. Tr. at 53. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding that a plaintiff's statements regarding the severity of her joint pain was not persuasive due, in part, to the fact that she only took mild, over the counter medication).

Therefore, a review of the evidence demonstrates that Plaintiff had elbow surgery in 1993 but continued to perform work activity until 2006. Tr. at 96 & 98. In February 2007, Plaintiff reported to Dr. Schreiber that her right elbow cramps if she writes for too long a period. Tr. at 194. In addition, Plaintiff did not have any current swelling, locking, grinding, or heat in her elbow. Tr. at 194. She also reported no peripheral numbness, burning, or tingling. Tr. at 194. Plaintiff stated that she is able to do all her normal activities of daily living ("ADLs"); all her normal household chores; and that she plans on residing by herself in her new home. Tr. at 195. Dr. Schreiber found

no evidence of heat, erythema, tenderness, effusion, or crepitus in Plaintiff's elbow. Tr. at 196. Dr. Schreiber found a normal range of motion in Plaintiff's elbow and normal upper extremity strength. Tr. at 197. In April 2007, Plaintiff reported aching, stinging, and cramping pain in her elbow mostly when she writes. Tr. at 139. Plaintiff stated that she cannot hold a pen or type for very long. Tr. at 139. At the ALJ Hearing in November 2008, Plaintiff testified that she only took over the counter anti-inflammatory medication for pain. Tr. at 53.

Since Plaintiff's elbow condition did not prevent her from working from 1993 through 2006; since Plaintiff only experiences cramping when she writes excessively; since Plaintiff's injury did not result in any significant clinical abnormalities; and since her injury only necessitates that she take over the counter anti-inflammatory medication, substantial evidence supports the ALJ's decision to omit Plaintiff's elbow condition from the severe impairments finding.

**b.        Whether Plaintiff's Sleep Apnea is a Severe Impairment**

Plaintiff contends that her sleep apnea is a severe impairment. Pl. Doc. 7 at 6-7. The Commissioner responds that Plaintiff's sleep apnea is not severe because it does not significantly limit her ability to perform basic work activities. Comm'r Doc. 9 at 10-11. After a review of the record in the case, the ALJ found that Plaintiff's sleep apnea is not a severe impairment because it has not resulted in any functional limitations. Tr. at 15.

In July 2008, Saieed Saieed, M.D., referred Plaintiff for a sleep study due to complaints of a persistent cough, heartburn, excessive daytime sleepiness, and snoring. Tr. at 352 & 357. Brijinder S. Kochhar, M.D., performed the sleep study and diagnosed Plaintiff with significant obstructive sleep apnea. Tr. at 355 & 357. Dr. Kochhar recommended that Plaintiff undergo a continuous positive airway pressure ("CPAP") study for therapeutic purposes. Tr. at 355 & 357.

Dr. Kochhar recommended that Plaintiff not drive or use machinery while feeling sleepy. Tr. at 355. Dr. Kochhar also stated that Plaintiff should not use sedatives, hypnotics, or alcoholic beverages while untreated for obstructive sleep apnea. Tr. at 355. There is no evidence in the record that Plaintiff followed through with Dr. Kochhar's recommendation for a CPAP study. Tr. at 352, 355, & 357. *See Mickles v. Shalala*, 29 F.3d at 930 (finding that an unexplained inconsistency between a claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility). Moreover, in a later report Dr. Kochhar concluded that acid reflux is the cause of Plaintiff's persistent cough. Tr. at 352. Dr. Kochhjar prescribed Nexium for Plaintiff and reported that she is doing well on that regimen. Tr. at 352. Dr. Kochhar also filled out a form for Plaintiff finding that she is able to resume responsibility and custody of her grandchildren. Tr. at 352. Finally, Dr. Kochhar referred Plaintiff back to her primary treating doctor for further follow up. Tr. at 352. In September 2008, Dr. Saieed noted that Plaintiff is having "occasional" fatigue. Tr. at 372.

Since Plaintiff did not follow-up with recommended therapeutic treatment; since she did not continue to complain about symptoms of sleep apnea; since acid reflux was the cause of her cough symptoms, which medication alleviated; since she was able to obtain medical clearance to assume custody of her grandchildren; and since she later reported only having "occasional" fatigue, substantial evidence supports the ALJ's finding that Plaintiff's sleep apnea was not a severe impairment.

### 3. Step Three: Determine whether the Plaintiff has a "Listed" Impairment

> If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [Subpart P of Part 404] and meets the duration requirement, we will find that you are disabled. *See* 20 C.F.R. § 404.1520(d).

The Listing of Impairments...describes...impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. *See* 20 C.F.R. § 404.1525(a).

Most of the listed impairments are permanent or expected to result in death. *See* 20 C.F.R. § 404.1525(a).

We need evidence from acceptable medical sources (e.g. licensed physicians) to establish whether you have a medically determinable impairment(s). *See* 20 C.F.R. § 404.1513(a).

To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies ***all of the criteria*** in the listing. *See* 20 C.F.R. § 404.1513(a) (emphasis added).

***An impairment that manifests only some of those criteria, no matter how severely, does not qualify***. *See Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885 (1990) (emphasis added).

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listing impairment. Tr. at 15. The parties do not dispute ALJ's findings in Step Three.

## * Residual Functional Capacity Assessment *
### (Needs to be Determined Before Proceeding to Step Four)

If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record...We use our residual functional capacity assessment at the fourth step of the sequential evaluation process to determine if you can do your past relevant work...and at the fifth step of the sequential evaluation process (if the evaluation proceeds to this step) to determine if you can adjust to other work...

Residual functional capacity assessment. Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record....

> Residual functional capacity is a measurement of the most a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a). According to the Social Security Administration, residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Regulation (SSR) 96-8p. Residual functional capacity is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain). *See* 20 C.F.R. § 404.1529(a).

*See* 20 C.F.R. § 404.1520(e); *see also* 20 C.F.R. § 404.1545(a); *see also Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006). The ALJ reviewed Plaintiff's medical evidence, severe impairments, physical and mental limitations, pain symptoms, daily activities, and credibility; and from the entire record, the ALJ concluded that Plaintiff has the residual functional capacity to perform a full range of light work. Tr. at 15.

> *Light work* involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work...

> *Sedentary work* involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met...If someone can do light work, we determine that he or she can also do sedentary work.

*See* 20 C.F.R. § 404.1567 (italics added).

**a.      Whether the ALJ Should Give Controlling Weight to Plaintiff's Treating Physician**

Plaintiff contends that the ALJ should have given adequate weight to the opinion of Plaintiff's treating physician, Cherian John, M.D., when determining Plaintiff's residual functional capacity.  Pl. Doc. 7 at 7-9.

> Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005).  Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.  The ALJ is not required in all cases to give the treating physician's opinion greater weight than other evidence; rather, "the ALJ holds [the] discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir.2001).

*Johnson v. Barnhart*, 434 F.3d 650, 654 & n.5 (4th Cir. 2005).  In October 2008, Dr. John completed a questionnaire and opined that Plaintiff could only sit for 4 hours in an 8 hour working day and that she could stand or walk for less than 2 hours in an 8 hour working day.  Tr. at 222-26.  Dr. John also opined that Plaintiff would need to walk for 5 minutes every 5 minutes during an 8 hour working day.  Tr. at 224.  The ALJ reviewed the record to determine whether the evidence supported the opinion of Dr. John and whether the evidence was consistent with the opinion of Dr. John.  Tr. at 17.

**(1)    Review of the Evidence in the Record Relevant to Evaluating whether to Give Controlling Weight to the Opinion of Plaintiff's Treating Physician**

**(a)    Osteoarthritis of the Right Knee**

In 1976, Plaintiff had surgery by George Medich, M.D., to have the cartilage removed from her right knee. Tr. at 97-98 & 211. In 1989, Dr. Medich performed arthroscopic surgery on her right knee. Tr. at 97-98 & 211. In 1990, Dr. Medich performed ligament replacement surgery on Plaintiff's right knee and removed the screws because they were coming loose. Tr. at 97-98 & 211. In February 2007, Dr. Schreiber examined Plaintiff and found that she was able walk without aids, that she was able to climb on and off the examination table repeatedly without difficulty or assistance, and that she had normal strength in her extremities. Tr. at 195 & 197-98. Dr. Schreiber did find minimal patellae femoral crepitus. Tr. at 196. In March 2007, Plaintiff stated that her knee gave out and she fell down the stairs. Tr. at 122. On April 4, 2007, Charles P. Capito, M.D., reviewed x-rays of Plaintiff's knee and noted "bone on bone" of the medial joint. Tr. at 211. Dr. Capito diagnosed Plaintiff with medial joint degenerative arthritis and slight effusion of the right knee. Tr. at 211. Dr. Capito prescribed Naprosyn and lateral heel wedges. Tr. at 211. On April 18, 2007, Plaintiff returned to Dr. Capito for knee pain, and he administered a steroid injection. Tr. at 212. On April 25, 2007, Dr. Capito wrote a letter to Dr. Saieed explaining that the steroid injection only helped Plaintiff minimally, and that he would schedule her for knee replacement surgery. Tr. at 336. In June 2007, Plaintiff postponed her knee surgery due to recurrent staph infection. Tr. at 145, 384, & 398. In March 2008, Plaintiff complained of knee pain and Dr. Saieed diagnosed knee arthritis. Tr. at 384. In September 2008, Plaintiff reported that she is postponing her knee surgery because she is currently asymptomatic. Tr. at 372.

## (b)        Post Myocardial Infarction

On October 19, 2006, Plaintiff went to the emergency room for a reaction to a spider bite. Tr. at 154.   Mitchell S. Fuscardo, D.O., ordered hospital staff to administer Epinephrine subcutaneously, but the staff erroneously administered the medication intravenously and caused Plaintiff to develop chest pain.  Tr. at 155.   On October 20, 2006, Dr. John examined Plaintiff following her admission to the hospital for chest pain and ordered that she undergo a heart catheterization.  Tr. at 252.  Following the surgery, Dr. John concluded that Plaintiff had moderate left ventricular systolic dysfunction, ejection fraction of 30%, severe hypokinesis in the mid anterior wall, and moderate hypokinesis distal inferior wall of the left ventricle.  Tr. at 256.  Dr. John recommended anti-platelet agents and anti-failure therapy.  Tr. at 256.  On November 6, 2006, Dr. John reported that Plaintiff was symptom free and he reduced her heart medication.  Tr. at 181.  On November 7, 2006, Plaintiff reported to Dr. Saieed that she feels much better, and he recommended she continue the heart medication.  Tr. at 184.

On January 4, 2007, an echocardiogram revealed normal left and right ventricle systolic and diastolic function, normal pulmonary artery systolic pressure, and an estimated ejection fraction of 60%.  On January 25, 2007, an echocardiogram revealed ejection fraction of 65%, but Plaintiff still complained of intermittent chest pain and fatigue.  Tr. at 191.  Dr. Saieed reduced Plaintiff's heart medication.  Tr. at 191.  In February 2007, at an examination with Dr. Schreiber, Plaintiff denied any current chest pain, edema, dyspnea, syncope, orthopnea, or paroxysmal nocturnal dyspnea.  Tr. at 194.  Plaintiff stated that she is able to do all her normal activities of daily living ("ADLs"); all her normal household chores; and that she plans on residing by herself in her new home that she recently purchased.  Tr. at 195.  In March 2007, Dr. John reported that Plaintiff's ejection fraction

improved to 65-70% and that she is doing well. Tr. at 370. Dr. John reduced Plaintiff's heart medication due to occasional lightheadedness. Tr. at 370. In July 2007, Plaintiff went to the University of Pittsburgh Medical Center Cardiovascular Institute for a second opinion regarding her cardiac care. Tr. at 338-40. Aryan Aiyer, M.D., noted that Plaintiff's EKG did not demonstrate any infarct pattern, so he was hopeful that her left ventricular function would recover with time. Tr. at 339. On August 16, 2007, Plaintiff had a follow-up with Dr. Saieed, and she reported no chest pain or shortness of breath. Tr. at 396. Dr. Saieed noted that the Pittsburgh cardiologist recommended starting Plaintiff on a lipid lowering agent and increasing her heart medication. Tr. at 396. In March 2008, Dr. John reviewed an echocardiogram and concluded that the study was essentially normal. Tr. at 365.

### (c)     State Agency Medical Consultant Reports

In February 2007, Porfirio Pascasio, M.D., a State Agency Medical Consultant Physician, reviewed the evidence of record and completed a physical residual functional capacity assessment form. Tr. at 199-206. Dr. Pascasio found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours, and sit about 6 hours during an 8 hour workday. Tr. at 200. He also found that Plaintiff could occasionally perform all postural maneuvers and needed to avoid concentrated exposure to temperature extremes and hazards. Tr. at 201 & 203.

On June 8, 2007, Thomas Lauderman, D.O., a second State Agency Physician, reviewed the evidence of record and completed a physical residual functional capacity assessment. Tr. at 213-20. Dr. Lauderman found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, sit about 6 hours, and stand and/or walk about 6 hours during an 8 hour workday. Tr. at 214. He also found that Plaintiff could occasionally perform postural maneuvers and needed to avoid

concentrated exposure to temperature extremes and vibration and all exposure to hazards. Tr. at 215 & 217.

**(2)      Conclusion by the ALJ as to whether to Give Controlling Weight to the Opinion of Plaintiff's Treating Physician**

In October 2008, Plaintiff's treating physician, Dr. John, completed a residual functional capacity questionnaire. Tr. at 222-26. Dr. John opined that Plaintiff could only sit for 4 hours in an 8 hour working day; that she could only stand or walk for less than 2 hours in an 8 hour working day; and that she would need to walk for 5 minutes every 5 minutes during an 8 hour working day. Tr. at 224. Dr. John further opined that Plaintiff could continuously sit for 2 hours and stand for 30 minutes; that Plaintiff needed to elevate her feet during prolonged sitting for 10% of the time during an 8 hour work day; and that she could frequently lift less than 10 pounds and occasionally lift 10-20 pounds. Tr. at 224-25. Dr. John also concluded that Plaintiff did not need to shift positions at will from sitting, standing, or walking; that Plaintiff would not need to take unscheduled breaks during an 8 hour working day; and that Plaintiff's impairments would never cause her to be absent from work. Tr. 224-25.

After a review of Plaintiff's medical history, the ALJ found that Dr. John's opinion and that his opinion was not supported by the evidence and not consistent with the record. Tr. at 17. The ALJ noted that in February 2007, Plaintiff told Dr. Schreiber that she is able to do all her normal activities of daily living ("ADLs"); all her normal household chores; and that she plans on residing by herself in her new home that she recently purchased. Tr. at 15 (ALJ decision); Tr. at 195 (Schreiber report). In March 2007, Dr. John reported that Plaintiff's ejection fraction improved to 65-70% and that she is doing well. Tr. at 370. In July 2007, Aryan Aiyer, M.D., noted that Plaintiff's EKG did not demonstrate any infarct pattern, so he was hopeful that her left ventricular

function would recover with time. Tr. at 339. In March 2008, Dr. John reviewed an echocardiogram and concluded that the study was essentially normal. Tr. at 365. In September 2008, Plaintiff reported that she has only "occasional" fatigue and is postponing her knee surgery because she is currently asymptomatic. Tr. at 372. At the ALJ Hearing in November 2008, Plaintiff testified that she only took over the counter anti-inflammatory medication for pain. Tr. at 53.

In addition to reviewing the record, the ALJ noted that Dr. John's conclusions are inconsistent without any explanatory rationale. Tr. at 17. On one hand, Dr. John opines that Plaintiff can only stand or walk for up to 2 hours in an 8 hour day and can only sit for 4 hours in an 8 hour day. Tr. at 17 (ALJ decision); Tr. at 224 (John assessment). On the other hand, Dr. John opines that Plaintiff can stand continuously for 30 minutes and can sit continuously for 2 hours. Tr. at 17 (ALJ decision); Tr. at 224 (John assessment). Moreover, Dr. John's conclusions are inconsistent with the evidence that Plaintiff can do all her daily activities; that she has only occasional fatigue; that her knee pain is asymptomatic; and that her left ventricular function is within a normal range. Tr. at 17 (ALJ decision); Tr. at 195, 339, 365, & 372 (medical reports).

Dr. John also concluded that Plaintiff did not need to shift positions at will from sitting, standing, or walking; that Plaintiff would not need to take unscheduled breaks during an 8 hour working day; and that Plaintiff's impairments would never cause her to be absent from work. Tr. 224-25. Therefore, the ALJ found that Dr. John's conclusion, that Plaintiff is not capable of completing a full 8 hour day, was purely conclusory, without any supporting explanation or rationale. It is similar to form reports in which a physician's obligation is only to check a box or fill in a blank. Such conclusions are weak evidence at best. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993).

After a review of Plaintiff's medical history, the ALJ found that Dr. John's conclusions were inconsistent with the evidence and were not supported by the record. Tr. at 17. Substantial evidence supports the ALJ's finding to not give controlling weight to the opinion of Dr. John.

**b.      Residual Functional Capacity Assessment Conclusion by the ALJ**

The ALJ found that the residual functional capacity finding that Plaintiff can perform light work is consistent with the opinion of the State Agency Medical Consultant, Dr. Lauderman, who found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, sit about 6 hours, and stand and/or walk about 6 hours during an 8 hour workday. Tr. at 17 (ALJ decision); Tr. at 214 (Lauderman assessment).

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence...

> When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician or psychologist, the administrative law judge will evaluate the findings using relevant factors in paragraphs (a) through (e) of this section, such as the physician's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of the opinions. Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources...

*See* 20 C.F.R. § 404.1527(f)(2). The ALJ agreed with the assessment of the State Agency Physician and attributed substantial weight to the opinion of Dr. Lauderman. Tr. at 17. The ALJ found that Dr. Lauderman's opinion is consistent with the medical evidence that Plaintiff has a normal gait, that she has normal strength in all her extremities, and that she can carry out her activities of daily living. Tr. at 17. Moreover, the ALJ noted that the finding that Plaintiff can do light work is consistent with Dr. John's recommendation that Plaintiff elevate her leg for 10% of the time, while she is seated, during an 8 hour work day. Tr. at 17. Accordingly, substantial evidence supports the ALJ's residual functional capacity assessment that Plaintiff can perform light work.

### 4. Step Four: Compare Residual Functional Capacity Assessment to Determine whether the Plaintiff Can Perform Past Relevant Work

> At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. 20 C.F.R. § 404.1520(a).
>
> Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it. 20 C.F.R. § 404.1560(b).
>
> Your impairment(s) must prevent you from doing your past relevant work. If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment...with the physical and mental demands of your past relevant work. (See § 404.1560(b).) If you can still do this kind of work, we will find that you are not disabled. *See* 20 C.F.R. § 404.1520(f).

The ALJ found that Plaintiff is unable to perform her past relevant work as a bar owner / manager because this is medium exertional work, which exceeds Plaintiff's residual functional capacity. Tr. at 17. The parties do not dispute the ALJ's findings in Step Four.

**5.      Step Five: Consider Residual Functional Capacity Assessment, Age, Education, and Work Experience to Determine if the Plaintiff Can Perform Any Other Work**

> At the fifth and last step...
>
> [i]f we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work.  We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

*See* 20 C.F.R. § 404.1520(a); *see also* 20 C.F.R. § 404.1560(c).  At the final step of the disability analysis, the ALJ considered Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony to determine whether Plaintiff could perform any other work.       The ALJ noted that Plaintiff was 59 years old during the period at issue, which makes her an individual of advanced age as defined in the Social Security Act. Tr. at 17.  The ALJ noted that she subsequently changed age category to closely approaching advanced age.  Tr. at 17.  *See* 20 C.F.R. § 404.1563 (age as a vocational factor).  The ALJ found that Plaintiff has a high school education and that she has acquired work skills from past relevant work. Tr. at 18.  *See* 20 C.F.R. § 404.1564 (education as a vocational factor); *see also* 20 C.F.R. § 416.968(d) (transferability of job skills).

Vocational Expert Karen Krull testified that someone with Plaintiff's residual functional capacity and work skills would be able to perform "light exertional" jobs such as cashier, bartender, and retail store manager.  Tr. at 56-57.  Ms. Krull stated that there were hundreds of thousands of these types of jobs available nationwide.  Tr. at 56-57.

After considering the Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony, the ALJ found that there are jobs that exist in the national economy that the Plaintiff could perform. Tr. at 18-19. Substantial evidence supports the ALJ's decision that Plaintiff could perform other work.

> Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence. *See Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 529. **Ultimately, it is the duty of the administrative law judge reviewing a case, and *not* the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.** *King*, 599 F.2d at 599. "This Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist*, 538 F.2d at 1056-57; "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock*, 483 F.2d at 775. **"The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"**

*See Hays*, 907 F.2d at 1456 (emphasis added). Therefore, this reviewing Court will uphold the ALJ's decision that Plaintiff could perform other work because it is supported by substantial evidence.

In conclusion, the ALJ found that based on the Plaintiff's application filed on September 19, 2006, the Plaintiff is not entitled to a period of disability or supplemental security income. Tr. at 18-19. The Court finds that substantial evidence supports the ALJ's decision that Plaintiff is not disabled and can perform other work in the national economy.

## III.    RECOMMENDATION AND CONCLUSION

The undersigned Magistrate Judge hereby **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment **[8]**, **DENY** Plaintiff's Motion for Summary Judgment **[7]**, and **AFFIRM** the Decision of the Administrative Law Judge.  The Court notes the Plaintiff's objections to the ruling.

Within ten (10) days of receipt of service of this Report and Recommendation, any counsel of record may file with the Clerk of the Court any written objections to this Recommendation.  The party should clearly identify the portions of the Recommendation to which the party is filing an objection and the basis for such objection.  The party shall also submit a copy of any objections to the District Judge.  Failure to timely file objections to this Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Recommendation.  28 U.S.C. § 636(b)(1).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: December 2, 2009**


DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE